IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

PATRICIA LOUISE WILLIAMS,
     Plaintiff,

vs.                              Case No.: 5:17cv254/EMT

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,
     Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* ECF Nos. 10, 11). It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed.

## I.    PROCEDURAL HISTORY

On May 5, 2014, Plaintiff filed an application for DIB, and in the application she alleged disability beginning October 7, 2013 (tr. 20).[1] Her application was denied initially and on reconsideration, and thereafter she requested a hearing before an administrative law judge ("ALJ").  A hearing was held on July 15, 2016, and on October 4, 2016, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (tr. 20–30).  The Appeals Council subsequently denied Plaintiff's request for review.  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

## II.    FINDINGS OF THE ALJ

In denying Plaintiff's claims, the ALJ made the following relevant findings (*see* tr. 20–30):

---

[1] All references to "tr." refer to the transcript of Social Security Administration record filed on January 29, 2018 (ECF No. 15).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

(1)     Plaintiff meets the insured requirements of the Act through December 31, 2018[2];

(2)     Plaintiff has not engaged in substantial gainful activity since October 7, 2013, the alleged onset date;

(3)     Plaintiff has the following severe impairments: degenerative disc disease ("DDD") of the cervical and lumbar spine, spondylosis of the lumbar spine with radioculopathy and sciatica, status post cervical fusions, obesity, hyperlipidemia, and hypothyroidism;

(4)     Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(5)     Plaintiff has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), except she can lift and carry twenty pounds occasionally, and ten pounds frequently; push/pull as much as she can lift or carry; and sit, stand, or walk six hours in an eight-hour workday. As for manipulative limitations, Plaintiff can frequently handle with the left hand, and as for postural limitations, Plaintiff can frequently climb ramps, stairs, ladders, ropes, or scaffolds;

(6)     Plaintiff is unable to perform any past relevant work;

(7)     Plaintiff was born on January 27, 1963, and was fifty years old, which is defined as an individual closely approaching advanced age, on the alleged onset date;

(8)     Plaintiff has at least a high school education and is able to communicate in English;

---

[2] Thus, the time frame relevant to Plaintiff's claim for DIB is October 7, 2013 (date of alleged onset), through December 31, 2018 (date last insured). *See* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which she is both disabled and has an SSI application on file).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not she has transferable job skills;

(10)     Considering Plaintiff's age, education, work experience, and RFC, there are jobs existing in significant numbers in the national economy that Plaintiff can perform; therefore, Plaintiff has not been under a disability, as defined in the Act, from October 7, 2013, through the date of the decision.

## III.   STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence.  42 U.S.C. § 405(g);

Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).  Pursuant to 20 C.F.R.

§ 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.     If the claimant is performing substantial gainful activity, she is not disabled.

2.     If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.     If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.     If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.     Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's

impairments, the claimant can perform. <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. <u>Hale v. Bowen</u>, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV. PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY

A. Relevant Personal and Employment History

Plaintiff, who stands at five feet, weighed about 209 pounds at the time of her hearing before the ALJ (tr. 43). She previously worked for an "in-home supportive living" agency, full time from 2004 to 2013 (tr. 46, 204). Her duties included administering medication to patients in their homes and assisting them with ambulation, bathing, and performing other activities of daily living (tr. 46–49). Plaintiff testified that she obtained a General Education Diploma and a Certified Nursing Assistant certificate ("CNA"), but her CNA lapsed when she failed to renew it (tr. 44–45). She also testified that she has a driver's license but will drive only if she has to attend a doctor's appointment or go to the store (tr. 44).

Plaintiff was involved in a motor vehicle accident on March 9, 2013 (tr. 445–46). On April 21, 2013, she returned to work with a doctor's note restricting her to "light duty," which she understood to mean she could not lift more than ten pounds and that all activities were to be "mild" (tr. 47, 67, 446). She lost her job on October

7, 2013, when she complained about an assignment that she felt was not "light duty" because it required dealing with an aggressive patient (tr. 46, 446). Thereafter Plaintiff went to a workforce center, but they would not accept her because of the "light duty" restriction (tr. 49). Plaintiff was involved in a second motor vehicle accident about a year later, on April 18, 2014 (tr. 447). She filed for DIB shortly thereafter, on May 5, 2014, claiming an alleged onset date of October 7, 2013, the day she lost her job.

With respect to her back, Plaintiff testified that she has problems standing and sitting too long, that it feels like a string is tied around her big toe, and that she must always wiggle her toes to stop the pain in her back from going into her foot (tr. 51). As for her neck, she stated that she has had problems in the C1-2 area including constant headaches and a clicking/popping sensation that lasts all day (tr. 53). She claimed that she cannot look over her shoulder unless she strains her eyes, and that her left side is worse than her right (tr. 53–54). She testified that it hurts to look down, and that she has numbness/tingling in her hands which affects her ability to hold things and causes her to drop items (tr. 71, 72–73). She claimed she has to lie down due to pain just about daily (tr. 74).

At the time of her hearing, she was prescribed Mobic and Gabapentin and took over-the-counter ibuprofen two to three times per day (tr. 54–55). She noted she had previously been prescribed Tramadol and hydrocodone but those were discontinued

because they made her itch (tr. 54). She also wore a back brace at the time of the hearing and testified that she wears it whenever she is "standing up, out, and driving" (tr. 56–57). Plaintiff stated that Karin Maddox, M.D., a treating physician with the Brain and Spine Center, recommended use of the back brace (tr. 57). Plaintiff claimed that gaps in her treatment exist due to her inability to afford medical care, noting that her co-pay is $60.00, and that she had to choose between seeking treatment or buying groceries (tr. 73).

Finally, Plaintiff testified that she is able to occasionally cook and go to the grocery store, but she does not do much housework and has trouble lifting a gallon of milk (tr. 58, 67). She also claimed that she would be unable to work in a job where she would be required to lift twenty pounds occasionally or stand/walk up to six hours a day (tr. 69).

B.     Relevant Medical History

<u>Evidence that Predates the Alleged Disability Onset Date</u>

On October 30, 2006, Plaintiff was injured at work, and a subsequent MRI revealed a "large disc herniation at C6-7 on the left side" (tr. 278). As a result, Plaintiff underwent an anterior cervical discectomy at C6-7 on March 21, 2007 (tr. 297).

Plaintiff was involved in a car accident (she was "T-boned") on March 9, 2013, and transported by ambulance to a hospital (tr. 445–46).  At a March 23, 2013, office visit with Dr. Maddox, Plaintiff reported constant neck and back pain that radiated to her upper and lower extremities (tr. 421).  She described the pain as sharp, burning, and throbbing, and felt it was moderate in severity but worsening since the accident (*id*.).  She had an antalgic gait, impairment of finger-to-nose coordination, impairment of rapid alternating movements, decreased range of motion of the cervical spine, and pain with flexion and extension of the lumbar spine, although her muscle strength was full and normal at "5/5" (tr. 418).  She was diagnosed with cervical radiculopathy, muscle spasms, and lumbar radiculopathy, and she was prescribed Lortab, Flexeril, and Diclofenac Sodium (tr. 417–18).

An MRI of the cervical spine was obtained on April 3, 2013, which revealed status post lower fusion at C6-7, but no other abnormalities (tr. 430).  NCV and EMG studies were conducted on April 4, 2013, which yielded normal results (tr. 436).  Dr. Maddox assessed right chronic moderate L4 and L5 lumbosacral polyradiculopthy (*id*.).  It was noted that Plaintiff had normal muscle bulk and tone, 5/5 strength bilaterally, normal and symmetric deep tendon reflexes, and normal sensations (tr. 435, 439).

An MRI of the lumbar spine was obtained on April 30, 2013, which revealed signs of a focal disc protrusion at the junction of the left foraminal and extraforaminal zones at L3-4, and signs of encroachment on the exiting left L3 nerve root (tr. 424). The MRI also revealed a subtle annular tear at the left foraminal zone at L4-5 and partial disc dehydration at L4-5 (*id.*).

At an office visit with Dr. Maddox on July 31, 2013, Plaintiff reported constant, burning neck and back pain, which radiated to her right leg, and which she rated at a four out of ten on a ten-point scale (hereinafter "[reported pain level]/10") (tr. 403). Dr. Maddox noted an antalgic gait, decreased range of motion of the cervical spine, pain with flexion and extension of the lumber spine, and multiple trigger points in her cervical and lumbar spine, but normal muscle strength at 5/5 (tr. 401). Dr. Maddox assessed lumbago, lumbosacral or thoracic radiculitis, cervicalgia, and cervical radiculopathy, and she referred Plaintiff for physical therapy (*see* tr. 310).

Plaintiff attended thirty physical therapy sessions from May 14, 2013, to September 17, 2013, with Wade Rinehart, DPT, of First Choice Therapy (tr. 306). At the conclusion of these sessions, Plaintiff had increased her bending and rotation in the cervical and lumbar spine, but she still had pain, decreased range of motion, and only "moderate" flexibility in most areas (tr. 306–07). Additionally, although she was still positive for the quadrant test bilaterally, her gait was normal, and she was no

longer positive for the distraction test or the straight leg raising test on the right (tr. 307–08). Her cervical mobility was noted to be "2/6" for C0-3 on the left and C3-6 on the right, and her lumbar mobility was "2/6" at L1-5 with "tone and guarding" (tr. 308). As of the September 17, 2013, post-therapy assessment, Dr. Rinehart felt that Plaintiff had "reached a plateau" in her care and had "reached maximal benefit from therapy to date," but he suggested a pain management plan including a home transcutaneous electrical stimulation unit (tr. 309). At the end of therapy, Plaintiff reported pain at a 5/10, which alternated among the cervical, thoracic, and low back areas (depending on "which one is worse on whatever particular day") and "no real change in her symptoms" (tr. 306).

Plaintiff returned to Dr. Maddox on September 24, 2013, and reported chronic pain over the previous three months (tr. 395). Dr. Maddox ordered a lumbar support brace for Plaintiff (*id*.). Dr. Maddox also planned to administer two bilateral diagnostic lumbar facet injections to decrease Plaintiff's pain (*id*.).

<u>Evidence from the Relevant Period (October 7, 2013, to October 4, 2016)</u>

On October 17, 2013, Plaintiff received the first diagnostic lumbar facet block at L3-4 and L4-5 bilaterally which decreased her pain from an 8/10 to a 4/10 (tr. 393, 594). On October 24, 2013, however, Plaintiff reported her pain was at a 10/10, so she received another injection (tr. 593). Twenty minutes later she reported decreased

pain and increased range of motion (*id*.). Although the second injection helped, Plaintiff's pain returned as of November 5, 2013 (tr. 391). On November 14, 2013, additional lumbar facet injections were administered, which decreased her pain from a 7/10 to a 5/10 (*see* tr. 386). On January 3, 2014, Plaintiff maintained that her neck and back pain radiated to her left leg, right arm, and right leg, and she described it as aching, burning, and stinging; she also noted the pain was "constant" (*id*.).

A January 7, 2014, CT scan of the lumbar spine revealed mild degenerative changes in the sacrioliac joints inferiorly, a minimal disc bulge at L4-5, minimal facet arthropathy on the left at L4-5 and on the right at L5-S1, and mild foraminal narrowing at L4-5 (tr. 422). The scan did not reveal any acute ossous abnormality but did show minimal degenerative change (*id*.). At a visit on January 10, 2014, Dr. Maddox noted that Plaintiff had an antalgic gait, decreased range of motion in the cervical spine, and multiple trigger points and pain with flexion and extension of the lumber spine, but full muscle strength at 5/5 (tr. 378). Plaintiff reported constant pain in her neck and lower back, which she rated at a 5/10, and she stated the pain was exacerbated by standing and motion (tr. 380). Plaintiff also stated that pain radiated to her right leg, which she described as "dull, deep, sharp, achy, throbbing, burning, shooting, and stabbing" (tr. 381). Her treatment included activity modification, non-steroidal anti-inflammatory medications, muscle relaxants, and prescribed exercises

(tr. 380). Plaintiff reported that she had been compliant with treatment and had "fair" symptom control (*id*.). Dr. Maddox prescribed Mobic, Robaxin, and ibuprofen (*id*.).

Plaintiff was first seen by treating physician Joel Franck, M.D. of the Bay Neurological & Spine Institute on March 18, 2014 (tr. 572). She complained of an unsteady balance and radiating, low back pain that burned, throbbed, and tingled (*id*.). She stated her pain was constant at a 4/5, but at times it increased to an 8/10 or a 9/10 and was accompanied by nausea and vomiting (*id*.). She reported the pain was exacerbated by bending and by long periods of sitting, standing, or walking (*id*.). She claimed that hot showers, relaxation, and medication helped, and she reported that she ate Advil "like candy" (*id*.). She also reported having urinary incontinence and urgency since her steroid injection on November 14, 2013 (tr. 578). Dr. Franck noted a positive Patrick's maneuver on the right; he found Plaintiff's neck to be stiff and tender with a limited range of motion; and he found kyphosis of the thoracic spine (tr. 581). As to the lumbar spine, Dr. Franck found tenderness, to include SI joint tenderness, as well as limited bending (to 45 degrees) and a positive straight leg raising test (at 45 degrees) (*id*.). It appears that Dr. Franck also found Plaintiff's deep tendon reflexes to be slightly abnormal, as he noted them to be to "2" in every area (instead of "2+," which is normal); he also noted a positive Hoffman's sign (tr. 583).

Finally, Dr. Franck described Plaintiff's gait as "tandem gait ataxia" and antalgic, and he noted that she was unable to walk heel to toe (*id.*).

A bone scan obtained on March 21, 2014, revealed nonspecific activity in the left posterior fourth rib, for which metastatic or Paget's disease could not be excluded (tr. 483). Diagnostic imaging of the lumbar spine from March 22, 2014, revealed no acute bony abnormality or translational sublaxation with flexion or extension (tr. 482).

As previously noted, Plaintiff was involved in a second motor vehicle accident on April 18, 2014. After this accident Plaintiff reported severe headaches and increased tingling (tr. 447). Diagnostic imaging (evidently a CT scan and/or an x-ray) obtained one week after the accident revealed postoperative changes but no acute process, disc protrusion, central stenosis, or significant foraminal narrowing (*see* tr. 479, 480). A May 3, 2014, MRI of the cervical spine revealed asymmetry at C1-2, indicating injury and/or laxity to the alar and transverse ligaments; a herniated disc at C5-6; bulging discs at C3-4, C4-5, and C7-T1; "straightened alignment suggesting muscle spasm"; and limited flexion and "more so extension ability" with no vertebral offset identified (tr. 610–11).

Plaintiff returned to Dr. Franck on May 21, 2014, and reported her pain was constantly at a 5/10 but increased to a 10/10 with certain movements (tr. 447). She rated her neck pain at a 5/10 (*id.*). She stated she experienced paresthesias in her

upper extremities when she elevated her arms to 90 degrees or higher (*id*.). She also reported phonophobia, photophobia, and nausea (*id*.). He observed Plaintiff to have an ataxic gait and unsteady balance, and to be stiff, tender, and moderately limited in range of motion (*id*.; *see also* tr. 445). Dr. Franck also noted that she was constantly shaking out her upper extremities as if they were weak and numb (tr. 447). He found no obvious pathology in the lumbar area and hoped that she just had soft tissue injury which would resolve over time (tr. 449). A May 22, 2014, CT scan of the cervical spine revealed that alignment was within normal limits, but the C2 left lamina was small and there was a well-corticated ossific fragment adjacent to the spinous process suggestive of a developmental variant of ossification (tr. 608). Dr. Franck assessed C1-2 lateral ligamentous instability secondary to cervical traumatic whiplash injury, post whiplash intractable migraine headaches, whiplash associated disorder and cranial cervical syndrome, post whiplash postraumatic cerebellar tonsillar ectopia and C1 capsulosynovitis, foramen magnum stenosis with cervical medullary junctional compression and transient vertebral artery compression, transient posterior fossa ischemia/transient ischemic attacks, and intractable cervical pain and radiculopathy and radiculomyelopathy (tr. 451). Finally, Dr. Franck commented: "She definitely has C1-2 lateral ligament[ous] instability causing her profound headaches that she had

never experienced before, and the other associated symptoms of the whiplash associated disorder (WAD) or the cranial cervical syndrome (CCS)" (tr. 449).

Dr. Franck performed a C1-2 fusion on June 10, 2014 (tr. 456). On June 11, 2014, a CT scan revealed post operative changes at the C1-2 fusion with bone fragmentation in the posterior surgical bed with a defect of the posterior-inferior occipital bone, and the prior C6-7 fusion (tr. 466). At a follow-up appointment on July 30, 2014, Plaintiff reported upper trapezius pain, and Dr. Franck noted that her neck was stiff and tender with limited range of motion and spasms (tr. 551). She was wearing a hard collar, but was prescribed a soft collar for the next six weeks (tr. 551–52). A radiograph of Plaintiff's cervical spine from July 30, 2014, revealed uncomplicated C1-2 and C6-7 fusion, and degenerative changes at C5-6 (tr. 595).

On December 3, 2014, Plaintiff was examined by advanced registered nurse practitioner ("ARNP") Pamela Perrin with Dr. Franck's office (tr. 660). Plaintiff reported neck stiffness and pain between a 2/10 and an 8/10, as well as popping noises and decreased range of motion in the neck, numbness in the head and posterior scalp, and tingling/numbness in her left hand (id.). As to her lower back, she reported constant pain on a scale between a 4/10 and a 10/10, intermittent burning, and left leg numbness and tingling down to her foot; she also reported urinary urgency and stated that her lower extremities felt cold and turned blue when she sat too long (id.).

Plaintiff reported that she was taking Advil but was not doing any physical therapy (*id*.).

ARNP Perrin observed that Plaintiff's neck was stiff and she had limited lateral range of motion with the left being worse than the right (tr. 661). Her thoracic spine was within normal limits, but she was positive for the straight leg raising test at 90 degrees on the right and at 70 degrees on the left (*id*.). She had 4/5 strength during her left upper motor examination, but 5/5 strength on the right and in her lower extremities (tr. 662). Plaintiff's sensory examination was normal except for a deficiency in the last three fingers of her left hand, diminished vibration in her left foot, and diminished pinprick in the left foot and ankle (tr. 663). She was also noted to have tandem gait ataxia and an antalgic gait (*id*.). ARNP Perrin assessed "cervical HCDs," instability, DDD, spondylosis, myelopathy, cervical syndrome, left knee pain, and lumbar pain (*id*.). Cervical x-rays from December 3, 2014, revealed that the fusion hardware was intact and that Plaintiff was stable with flexion and extension (*id*.). ARNP Perrin opined that Plaintiff's range of motion and lumbar pain would benefit from physical therapy, but she also opined that based on Plaintiff's "complaints and exam" it would be "difficult, if not impossible to perform CNA full time duties" (*id*.).

Plaintiff was examined by Kenneth Ellison, a Physician's Assistant with the Florida Institute of Neuroscience on April 7, 2016 (tr. 688). She reported low back pain that radiated to both legs and knees that was at an 8/10 on most days (*id*.). PA Ellison found mild diffuse tenderness over the lumbar spine and decreased range of motion of the lumbar spine (tr. 689). He found no pain with extension or SI joint tenderness (*id*.). He noted that Plaintiff's muscle strength was 5/5, her gait was normal, and her straight leg raising test was negative (*id*.). He assessed chronic midline low back pain with bilateral sciatica (*id*.).

An MRI of the lumber spine was obtained on April 14, 2016, which revealed disc bulges at L3-4 and L4-5 which contributed to minimal narrowing of the formina, bilaterally (tr. 680). Upon reviewing this MRI, PA Ellison found mild spondylitic changes through the lumber spine, mild multilevel facet anthropathy, and minimal disc bulges at L4-5 and L5-S1 (tr. 685). He assessed spondylosis of the lumbar region without myelopathy or radiculopathy (*id*.). He felt there were no good surgical treatment options for Plaintiff and that her urinary urgency was not caused by lumbar issues (*id*.).

Although cervical x-rays obtained on June 8, 2016, revealed some "densities" with the previous fusion surgery at C6-7, no loose or migrated foreign bodies were present, and no complication was suspected (tr. 693). As for the fusion at C1-2, the

reviewer noted some asymmetry of the surgically placed screws at C1-2, but the significance of this could not be determined (*id.*).

Plaintiff was seen by George Barrio, M.D., of The NeuroPain Center on June 10, 2016 (tr. 703). She reported pain at an 8/10 and stated that it was constant, sharp, burning, and that it radiated into both legs (tr. 703–04). Dr. Barrio found normal muscle tone, 5/5 strength in all muscle groups, moderate tenderness over the lumbar paraspinal muscle that was significantly worse with hyperextension and side bending, decreased vibratory sensation in both feet, and an antalgic gait (tr. 705). He assessed lumbar radiculopathy, lumbar spondylosis, and lumbar DDD (*id.*). Dr. Barrio noted that Plaintiff continued to complain of a significant amount of pain after conservative treatment, so he prescribed Norco for pain management (tr. 705–06).

At the request of Dr. Barrio, Plaintiff underwent EMG and NCV studies on June 15, 2016, which revealed evidence of mild chronic L5 radiculopathy on the right (tr. 696). He did not recommend different treatment (*id.*). As of June 21, 2016, Plaintiff was taking hydrocodone and six to eight 200 mg tablets of ibuprofen daily, using Aspercreme, using a back brace for her back pain, and using an over-the-counter elastic brace for knee support (tr. 257).

C.    Other Information Within Plaintiff's Claim File

Plaintiff's husband, George Williams, completed a third-party questionnaire on May 29, 2014 (tr. 198–200). He reported that Plaintiff complained of bad headaches, back pain, arm pain, leg pain, and numbness in her extremities (tr. 198). He noted that Plaintiff took Norco pain medication, but that it made her "itch[] all over" (tr. 199). He claimed that Plaintiff tossed, turned, and whimpered throughout the night (*id*.). He stated that Plaintiff could cook light meals, do little jobs around the house, do light shopping, drive, and water the garden, although some of the activities still caused pain and required her to take breaks (tr. 199–200).

Plaintiff completed a supplemental pain questionnaire on May 30, 2014 (tr. 201–03). She reported lower back pain, neck pain, and headaches (tr. 201). She stated it hurt if she bent over or when she stood, sat, or walked for too long (*id*.). She claimed that her upper neck tingled and her headaches increased when she raised her arms above her head (*id*.). She additionally claimed to experience pain "all day, every day" that also affected her sleep (tr. 202). Her pain was relieved by lying flat, keeping her feet up, and changing positions (*id*.). She previously took Advil and Tylenol for pain, but switched to "hydoco/aceta" 325mg tablets every six hours which relieved some of the pain, but also made her itch, caused drowsiness, hurt her stomach, and affected her ability to drive (*id*.). She stated she was able to cook light meals, dress herself, groom herself, vacuum, mop, load (but not unload) laundry, shop for light

groceries, drive short distances, and water the garden, but she experienced pain and often needed assistance and/or modifications with every activity (*id*.). She could sit for thirty minutes, stand for twenty minutes, and walk twenty minutes before she experienced pain (tr. 203). She could not pull, lift, or push more than twenty pounds (*id*.).

Dr. Franck completed a Treating Source Orthopedic Questionnaire on July 28, 2014 (tr. 540–41). He assessed Plaintiff with status post C1-2 posterior autograft and fusion (tr. 540). He noted decreased grip strength, decreased ability to perform fine and gross manipulation, chronic pain, and limited range of motion (tr. 541). He also noted that Plaintiff had moderate upper extremity weakness and could not lift anything above her waist (*id*.). He stated she had severe pain when turning her neck or bending, as well as stiffness, tenderness, and decreased range of motion (tr. 541). He rated her grip strength and lower extremity strength at 3/5 (*id*.). He felt that any attempt to use her neck would be "unsuccessful" and that she could not perform fine/gross manipulations on a sustained basis secondary to her weakness (*id*.).

On August 20, 2014, Krysztof Lewandowski, M.D., performed a one-time consultative examination at the Commissioner's request (tr. 630–31). Plaintiff reported neck pain, lower back pain, and a burning, tingling, hot, pulsing pain behind her right knee (tr. 630). She rated her pain at a 5/10 on average (*id*.). Dr.

Lewandowski noted that Plaintiff was wearing a collar and was reluctant to remove it because her treating physician had advised her not to remove it (*id*.). Dr. Lewandowski found Plaintiff's neurological examination to be normal, and he noted that Plaintiff's function did not seem impaired, that her grip and manual dexterity were normal, and that her gait was normal (tr. 631). He also felt that her prognosis "should be good" after recovery from surgery (*id*.).

Lionel Henry, M.D., a non-examining agency physician, assessed Plaintiff's physical capacities on October 24, 2014 (tr. 101). He opined that Plaintiff could occasionally lift and/or carry twenty pounds; could frequently lift and/or carry ten pounds; could stand or walk with normal breaks for about six hours; could sit with normal breaks for about six hours; and was otherwise unlimited in pushing and pulling (tr. 99–100). Dr. Henry also found she was frequently limited in climbing ramps/stairs and ladders/ropes/scaffolds, but unlimited in balancing, stooping, kneeling, crouching, and crawling (tr. 100). Dr. Henry further found her to be limited in handling on the left, but unlimited in reaching, fingering, and feeling (tr. 101). He assessed no visual, communicative, or environmental limitations (*id*.).

In early December 2014, Dr. Franck completed another treating source questionnaire after having examined Plaintiff on July 30, 2014, and on December 3,

2014 (tr. 635).[3] He maintained diagnoses of herniated cervical disc, cervical DDD, cervical stenosis, cervical instability, lumbar myelopathy, and lumbar spinal stenosis (*id*.). He indicated Plaintiff had decreased ability to perform fine manipulation, gait disturbance, sensory loss, episodic periods of remission and exacerbation, and substantial muscle weakness with repetitive activity (tr. 636). Dr. Franck rated her grip strength as slightly decreased at 4/5, but noted her lower extremity strength to be full at 5/5, and he opined that she did not need an assistive device to ambulate (*id*.).

Finally, a vocational expert ("VE") testified at Plaintiff's hearing. The VE testified that a hypothetical person with Plaintiff's RFC could not perform her past relevant work (tr. 76). The person could, however, perform other available work such as an office clerk assistant, ticket clerk, and house sitter, all of which are performed at the light level of exertion and otherwise accommodate Plaintiff's RFC (*id*.). The VE also testified that there would be no semi-skilled work available if Plaintiff was limited to sedentary work (tr. 77).

V.    DISCUSSION

---

[3] Although the questionnaire bears a partially indecipherable handwritten date of "11/[illegible]/14" next to Dr. Franck's signature (*see* tr. 636), it is evident that the questionnaire was not finalized until after Plaintiff had been examined by Dr. Franck on December 3, 2014, as he specifically indicated on the questionnaire that this was the date of his last examination, and he returned the completed document, by fax, to the Commissioner on December 12, 2014 (*see* tr. 635).

Plaintiff raises two issues in this appeal. She contends: (1) the ALJ erred in determining her RFC, specifically in weighing the medical opinions of record; and (2) the ALJ erred in evaluating her subjective complaints of pain and other symptoms.

A.    RFC and Weighing of Opinion Evidence

The Eleventh Circuit has noted that the focus of any RFC assessment is on the doctors' evaluations of a claimant's condition and the resulting medical consequences. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). An ALJ must consider and evaluate every medical opinion received. 20 C.F.R. § 404.1527. Additionally, in assessing the medical evidence, the ALJ must "state with particularity the weight he gave the different medical opinions and the reasons therefor." Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987) (citing MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986)). Thus, while it is true the determination of disability under the Act is reserved to the Commissioner, the ALJ is nevertheless required to consider and explain the weight given to opinions of medical doctors. *See* 20 C.F.R. § 404.1527(d); McCloud v. Barnhart, 166 F. App'x 410, 419 (11th Cir. 2006) (unpublished) (remanding where ALJ did not explain weight given to consulting psychologist's report or the reasons for discrediting his opinion).[4] Although the ALJ

---

[4] The undersigned cites McCloud and any other unpublished cases herein only as persuasive authority and recognizes that such opinions are not considered binding precedent. *See* U.S. Ct. of App. 11th Cir. Rule 36-2. The undersigned does the same with respect to opinions of circuit courts of appeals other than the Eleventh Circuit, *see* United States v. Rosenthal, 763 F.2d 1291, 1294 n.4

has wide latitude to evaluate the weight of the evidence, he must do so in accordance with prevailing precedent.

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Chater, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(c). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and

---

(11th Cir. 1985), and any district court opinions cited herein.

is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(c)(2).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c). Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion. *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(c)(2).

The weight an ALJ must give medical opinions varies according to the relationship between the medical professional and the claimant. 20 C.F.R. § 404.1527(c). For example, in addition to the considerations afforded to the opinions of treating physicians, the opinions of examining physicians are generally given more weight than non-examining physicians, and specialists' opinions on issues within their areas of expertise receive more weight than non-specialists' opinions. *See id.*; Preston v. Astrue, No. 2:09-cv-0485-SRW, 2010 WL 2465530, at *6 (N.D. Ala. June 15, 2010).

Finally, with respect to non-examining State agency medical consultants or other program physicians, the regulations explain that an ALJ is required to consider their opinions because they "are highly qualified physicians . . . who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i). An ALJ may rely on opinions of non-examining sources when they do not conflict with those of examining sources. Edwards v. Sullivan, 937 F.2d 580, 584–85 (11th Cir. 1991). Where the ALJ has discounted the opinion of an examining source properly, however, the ALJ may rely on the contrary opinions of non-examining sources. *See* Milner v. Barnhart, 275 F. App'x 947 (11th Cir. 2008) (unpublished) (where ALJ rejected conflicting opinion of one-time examining physician properly, ALJ did not err by giving substantial weight to the opinions of non-examining physicians).

Here, Plaintiff argues that the ALJ erred in weighing the opinions of Dr. Franck, Dr. Lewandowski, and Dr. Henry, and generally contends that the ALJ made findings as to each physician that lack substantial support in the record as a whole. The court agrees with Plaintiff.

Treating Physician Joel Franck, M.D.

The ALJ assigned "partial weight" to Dr. Franck's opinions on the Orthopedic Questionnaire from July 28, 2014. In so finding, the ALJ stated, "Dr. Frank's [sic]

opinion is given partial weight because his *examination* of the claimant was very recent in time to her surgery, so her weakness displayed is not consistent with the overall medical evidence of record" (tr. 27) (emphasis added). The court has struggled to reconcile the ALJ's reasons for discounting Dr. Franck's opinions with the record, particularly because the ALJ failed to identify the examination to which he referred in rejecting the opinions rendered by Dr. Franck in July 2014.

To the extent the ALJ was referring to the examination conducted by Dr. Franck in May 2014, the ALJ erred in discrediting Dr. Franck's opinions because they would have been based on an examination he conducted *before* Plaintiff's June 2014 surgery. Dr. Franck wrote on the first page of Questionnaire that Plaintiff was status post C1-2 posterior autograft and fusion (*see* tr. 540). Thus, Dr. Franck obviously considered Plaintiff's post-surgical condition in rendering his opinions in July. Moreover, although at the time Dr. Franck completed the Questionnaire he evidently had not examined Plaintiff since May 21, 2014, it was he who performed Plaintiff's intervening surgery on June 10 (*see* tr. 451–55). As Plaintiff's treating physician and surgeon, Dr. Franck was in a unique position to access Plaintiff's condition—and offer opinions regarding her restrictions and limitations—following the surgery.

To the extent the ALJ was referring to the examination conducted by Dr. Franck in July 2014, the ALJ appears to have reasoned that the examination was too soon

after Plaintiff's June 2014 surgery and thus not a true reflection of her ultimate post-surgical condition. But there are two flaws with this reasoning. First, as will be seen below, the ALJ did *not* find that Dr. Lewandowski's examination—conducted only about a month after Dr. Franck's examination—was "too recent in time" to Plaintiff's surgery, such that his resulting opinions had to be discredited. Second, Dr. Franck completed the Questionnaire on July 28, 2014, but he did not examine Plaintiff in July until the 30th, so if the ALJ was referring to Dr. Franck's July examination (as being too close in time to the surgery) the reason he cites for discrediting Dr. Franck's July 28 opinions cannot be squared with the record, because the July examination took place after the opinions were rendered.

Furthermore, even if the lack of a post-surgery, pre-Questionnaire examination by Dr. Franck was a legitimate and well-supported reason to discount Dr. Franck's July 2014 opinions (a finding the undersigned does *not* make, as explained above), the ALJ never specifically articulated this as a reason for discounting the opinions, and it is not the role of this court to create an after-the-fact justification for the ALJ's findings. *See, e.g.,* SSR 82-62 (eff. Aug. 20, 1980) ("The rationale for a disability decision must be written so that a clear picture of the case can be obtained. The rationale must follow an orderly pattern and show clearly how specific evidence leads to a conclusion."); Allen v. Barnhart, 357 F.3d 1140, 1145–45 (10th Cir. 2004)

(district courts should not draw factual conclusions on behalf of an ALJ or create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision itself) (citing <u>SEC v. Chenery Corp.</u>, 318 U.S. 80 (1943)); <u>Cline v. Sullivan</u>, 939 F.2d 560, 565 (8th Cir. 1991) ("It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence . . ."); <u>Green v. Shalala</u>, 51 F.3d 96, 101 (7th Cir. 1995) (to permit an informed review, ALJ must articulate his analysis of the evidence; "[o]nly then may a reviewing court track the ALJ's reasoning and be assured that the ALJ considered the important evidence").

In any event, Dr. Franck completed a second Questionnaire in December 2014, after he had examined Plaintiff on two occasions following her June 2014 surgery (*see* tr. 635 & n.3, *supra*), but the ALJ still chose to assign only "partial weight" to the opinions on that Questionnaire. More specifically, the ALJ stated that "Dr. Frankel's [sic] . . . opinion about the claimant's gait disturbance and decreased grip strength and fine motor skills, are not supported by the medical evidence of record, and is also inconsistent with Dr. Frank's [sic] own record that opined that the claimant exhibited improvements in her lower extremities, and improvement in her grip strength" (tr. 28). Putting aside the ALJ's repeated misspelling of the name of Joel Franck, M.D., the

ALJ's reasons for discounting Dr. Franck's December 2014 opinions also lack substantial support.

Initially, the ALJ failed to acknowledge that the second Questionnaire was completed after Dr. Franck examined Plaintiff in December 2014, or six months post-surgery, such that the examination was *not* "too recent in time" to Plaintiff's surgery to be unworthy of consideration. Similarly, to the extent the ALJ previously considered the lack of a post-surgery, pre-Questionnaire examination in discrediting Dr. Franck's July opinions, the ALJ should have at least acknowledged that the December opinions came after Dr. Franck had examined Plaintiff twice following her surgery. Yet the ALJ's decision is silent on this point.

Additionally, the ALJ stated that Dr. Franck's finding of a gait disturbance (on the December 2014 Questionnaire) was not substantiated by the medical evidence of record, but the record clearly reflects otherwise (*see, e.g.*, tr. 378 ("antalgic gait"), 583 ("tandem gait ataxia," "antalgic," "unable to heel/toe walk"), 445 ("ataxic gait" and "unsteady balance"), 663 ("tandem gait ataxia" and "antalgic"), 705 ("antalgic gait")). These multiple observations of a gait disturbance were noted by different providers on different occasions over the course of the relevant period; they are wholly consistent with Dr. Franck's opinions; and they refute the ALJ's reasoning.

Finally, the ALJ found that Dr. Franck's opinion regarding decreased grip strength was not supported by other evidence of record, but here again the ALJ erred. The Questionnaire completed by Dr. Franck in December 2014 asked him to generally assess Plaintiff's "grip strength," and he did so, rating it at "4/5"; it did not ask him to separately assess right and left grip strength (tr. 636). In a narrative section of the Questionnaire, however, Dr. Franck noted tingling and numbness in the left hand (*id.*). These findings are consistent with those of ARNP Perrin who also specifically noted sensory deficits in Plaintiff's left hand and rated Plaintiff's grip strength in the *left* hand at 4/5 in December 2014 (tr. 662–63).

For all of these reasons, the ALJ failed to articulate good cause for discounting the opinion of treating physician Joel Franck.

<u>One-Time Consultative Examiner Krzysztof Lewandowski</u>

The ALJ assigned "great weight" to Dr. Lewandowski's opinions because they were "supported by the results of Dr. Lewandowski's own physical examination of the claimant [in August 2014]" and "his thorough review of the claimant's surgical history" (tr. 28).

This is a textbook case of an ALJ "picking and choosing" favorable evidence to support his conclusions. As discussed above, Dr. Franck examined Plaintiff on multiple occasions and obviously knew her full surgical history before he offered his

opinions in December 2014, yet the ALJ overlooked those factors when he discounted Dr. Franck's opinions, but he relied upon them exclusively when he assigned great weight to the opinions of one-time consultative examiner Lewandowski. *See, e.g.*, Hardman v. Barnhart, 362 F.3d 676, 681 (10th Cir. 2004) ("It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence."); Bauzo v. Bowen, 803 F.2d 917, 923 (7th Cir. 1986) (evidence favoring the claimant, as well as evidence favoring the claim's rejection, must both be examined "since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight") (citations omitted).

What is more, although Dr. Lewandowski's two-page report references Plaintiff's motor vehicle accidents and surgeries, the undersigned has found no support for the ALJ's statement that Dr. Lewandowski thoroughly reviewed Plaintiff's surgical history (*see* tr. 630–31). Put simply, there is no indication that Dr. Lewandowski reviewed any medical records, treatment records, diagnostic imaging reports, or the like (*id.*). Instead it appears he relied only on Plaintiff's statements describing her medical history and identifying her treating physician/surgeon (*id.*).[5]

---

[5] As with the ALJ, Dr. Lewandowski referred to Plaintiff's surgeon incorrectly (*see* tr. 630, listing "Dr. Frack"), suggesting he saw no written record containing Dr. Franck's name.

Furthermore, Dr. Lewandowski's physical examination was incomplete, as Dr. Lewandowski was reluctant to fully examine Plaintiff's neck for fear of injuring it further (*see* tr. 631). Thus, no cervical spine range of motion testing was conducted, and the Range of Motion Report form completed by Dr. Lewandowski is correspondingly incomplete (*see* tr. 632–34).

Finally, the opinion of a treating physician such as Dr. Franck is entitled to more weight than the opinion of a consulting physician such as Dr. Lewandowski, as is the opinion of specialist (Dr. Franck is a neurosurgeon, *see* tr. 549), over that of a non-specialist (Dr. Lewandowski's speciality is internal medicine (tr. 26)). *See, e.g.,* 20 C.F.R. § 404.1527 (c)(2).

In sum, the court finds the ALJ's reasoning for affording Dr. Lewandowski's opinion "great weight" is not based on substantial evidence in the record as a whole.

<u>Non-Examining Agency Consultant Lionel Henry</u>

The ALJ also afforded "great weight" to Dr. Henry's opinions and did so based on Dr. Henry's "extensive review of the claimant's medical history," his familiarity with the rules and regulations of social security, his years of experience in the field, and his overall consistency with the medical evidence of record (tr. 28).

While it is true that "State agency medical . . . consultants are highly qualified physicians . . . who are experts in the evaluation of the medical issues in disability

claims under the Act," the opinions of non-examining medical sources, "when contrary to those of examining [sources], are entitled to little weight in a disability case, and standing alone do not constitute substantial evidence." Sharfarz, 825 F.2d at 280. Here, Dr. Henry's opinions are contrary to those of Dr. Franck. Moreover, Dr. Henry based his opinions on an incomplete record, because Dr. Franck's treatment records were not a part of Plaintiff's claims file at the time Dr. Henry offered his opinions. In fact, Dr. Henry assigned "little weight" to Dr. Franck's opinions on the July 2014 Questionnaire due to the missing records, stating "multiple attempts to obtain medical records from his office ha[d] been unsuccessful," and thus there were "no records in [Plaintiff's claims] file that support [Dr. Franck's] medical opinion" (tr. 99). Even if this was a valid basis to reject Dr. Franck's opinions at the initial level of review, as Dr. Henry did (*see id.*), by the time the ALJ rendered his decision Dr. Franck's treatment records were part of the claims file. Therefore, the basis articulated by Dr. Henry for rejecting Dr. Franck's opinions no longer existed when the ALJ issued his decision, a point the ALJ failed to mention. Finally, Dr. Henry's opinions were provided in October 2014, some two years before the relevant period ended. As such, the opinions do not reflect Plaintiff's condition during the majority of the time frame relevant to her claim, nor do they constitute substantial evidence to support the ALJ's ultimate findings.

In conclusion, the ALJ's RFC determination—which stems directly from the ALJ's erroneous evaluation of the opinions of Drs. Franck, Lewandowski, and Henry—is not supported by substantial evidence in light of the record as a whole.

B.    Subjective Complaint Analysis[6]

Plaintiff next faults the ALJ's evaluation of Plaintiff's testimony regarding her symptoms and limitations.  Specifically, Plaintiff contends that the ALJ erroneously rejected her testimony because of her lack of continued treatment and a general lack of medical evidence supporting her subjective complaints of pain and other symptoms.

When a claimant attempts to establish disability through her own testimony about her pain or other subjective symptoms, a two-part "pain standard" applies. Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The pain standard requires the claimant to show "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise" to the claimed symptoms.    Wilson, 284 F.3d at 1225; *see also* 20 C.F.R. § 404.1529(a)–(b).    If the ALJ determines that the claimant has a medically determinable impairment that could reasonably produce the claimant's pain or other

---

[6] Although the undersigned has already concluded that a remand is necessary in this case for reconsideration of Plaintiff's RFC, a brief discussion of the ALJ's subjective complaint analysis is also included for the Commissioner's consideration upon remand.

symptoms, then the ALJ evaluates the extent to which the intensity and persistence of those symptoms limit the claimant's ability to work. 20 C.F.R. § 404.1529(b)–(c). At this stage, the ALJ considers the claimant's history, the medical signs and laboratory findings, the claimant's statements, statements by medical sources, and other evidence of how the pain affects the claimant's daily activities and ability to work. *Id*. § 404.1529(c).

An ALJ must "articulate explicit and adequate reasons" for discrediting a claimant's allegations of completely disabling symptoms. Foote, 67 F.3d at 1561–62. "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court." Id., 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)). The ALJ's determination does not need to cite "'particular phrases or formulations,'" but it cannot merely be a broad rejection of a claimant's allegations which is "'not enough to enable [the court] to conclude that [the ALJ] considered her medical condition as a whole.'" Foote, 67 F.3d at 1561 (quoting Jamison v. Bowen, 814 F.2d 585, 588–90 (11th Cir. 1987)); *see also* Dyer v. Barnhart, 395 F.3d 1206 (11th Cir. 2005) (same).

Although an ALJ is permitted to discredit a claimant's subjective testimony of pain and other symptoms, the ALJ should consider that symptoms can vary over time. Under Social Security Ruling ("SSR") 16-3p:

If an individual's various statements about the intensity, persistence, and limiting effects of symptoms are consistent with one another and consistent with the objective medical evidence and other evidence in the record, we will determine that an individual's symptoms are more likely to reduce his or her capacities for work-related activities or reduce the abilities to function independently, appropriately, and effectively in an age-appropriate manner. However, inconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time. This may explain why an individual's statements vary when describing the intensity, persistence, or functional effects of symptoms.

SSR 16-3p (eff. Mar. 28, 2016).[7]

---

[7] SSR 16-3p rescinded SSR 96-7p, which provided guidance on how to evaluate the credibility of a claimant's statements about subjective symptoms like pain. *See* SSR 16-3p, 81 Fed. Reg. 14166, 14167 (March 9, 2016); SSR 96-7p, 61 Fed. Reg. 34,483 (June 7, 1996). The new ruling eliminated the use of the term "credibility" in the sub-regulatory policy and stressed that when evaluating a claimant's symptoms the adjudicator will "not assess an individual's overall character or truthfulness" but instead will "focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities. . . ." SSR 16-3p, 81 Fed. Reg. 14166, 14171. Under SSR 16-3p, adjudicators will continue to consider whether the "individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record." *Id*. at 14170.

To be sure, "SSR 16-3p provides clarification of the subjective pain standard; it does not substantively change the standard." Harris v. Berryhill, No. 5:16-cv-01050-MHH, 2017 WL 4222611, at *3 n.2 (N.D. Ala. Sept. 22, 2017); *see also* Griffin v. Berryhill, No. 4:15-cv-0974-JEO, 2017 WL 1164889, at *6 n.10 (N.D. Ala. March 29, 2017) ("The Eleventh Circuit's pain standard is consistent with the parameters that SSR 16-3p set forth."). There is a October 25, 2017, version of SSR 16-3p, which supersedes the March 16, 2016, version, only in order to address the applicable date of the ruling and its retroactivity. 2017 WL 5180304, at *13 n.27. The versions are materially the same in all other respects. *Compare* 2017 WL 5180304, *with* 2016 WL 1119029. Nevertheless, the court cites the March 2016 version here, because the ALJ's decision issued on October 4, 2016. *See, e.g.*, Hargress v. Soc. Sec. Admin., Comm'r, 883 F.3d 1302, 1308 (11th Cir. 2018) (finding that SSR 16-3p applies only prospectively).

Here, the ALJ generally concluded that while Plaintiff's impairments would reasonably be expected to cause the alleged symptoms, her allegations regarding the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the evidence of record (tr. 25).

The ALJ first found that Plaintiff's complaints of "severe lower back/lumbar spine pain with radiculopathy and sciatica" are not supported by the overall objective medical evidence of record (tr. 26). The ALJ referenced a January 2014 CT scan, which revealed only a minimal disc bulge at L4-5, minimal facet arthropathy at L4-5 and L5-S1, and mild degenerative change with no acute osseous abnormality, and found these scan results to be "inconsistent with the degree of limitation alleged by the [Plaintiff]" (tr. 26). But this CT scan was obtained before Plaintiff's motor vehicle accident in April 2014. Thus, the scan is not probative of Plaintiff's condition following the accident; nor does it shed light on her condition during most of the relevant three-year period from approximately October 2013 to October 2016.

The ALJ then referenced ARNP Perrin's records from December 2014, as well as the lumbar MRI results and PA Ellison's records from April 2016, in noting that Plaintiff had spondylosis of the lumbar region with radiculopathy and mild disc bulges, but no evidence of herniation, neuroforminal stenosis, fractures, or subluxations (tr. 26). The ALJ found these records to be "consistent with the overall

medical evidence of record as a whole" and "consistent with the residual functional capacity, which includes postural limitations" (tr. 26). It is unclear how the ALJ was able to determine that ARNP Perrin's records, PA Ellison's records, and/or the MRI results are consistent with the RFC. For example, the page of Perrin's records referenced by the ALJ (Exhibit 11F at page 6, or tr. 663) reflects multiple abnormalities or physical deficits such as instability, lumbar pain, left knee pain and inflammation, an antaglic gait, etc. (tr. 663). Moreover, nothing on that page speaks to Plaintiff's ability to perform postural movements such as climbing ramps, stairs, ladders, ropes, and scaffolds, which the ALJ found Plaintiff was able to do frequently as part of her RFC (*see* tr. 663, 24). As for PA Ellison, the ALJ merely reiterated the MRI findings of April 2016, which Ellison noted in his treatment record dated April 20, 2016 (*see* tr. 26 (referencing Exhibit 15F at 4, or tr. 685)). PA Ellison offered no opinions as to Plaintiff's capabilities or prognosis, other than to note that no good surgical options were available to Plaintiff at that time and that she should consider a referral to a pain management physician (*see* tr. 684–85). It is therefore unclear how the ALJ found this evidence to be consistent with the RFC.

The ALJ also referenced treatment notes and nerve conduction studies from June 2016 which found evidence of radiculopathy at L5, but the ALJ again appeared

to undermine the radiculopathy finding by referring to the January 2014, pre-accident diagnostic imaging study (*see* tr. 26).

Finally, the ALJ pointed to a lack of corroborating "overall objective medical evidence of record," but this is insufficient to support his findings as to Plaintiff's subjective complaints of pain and other symptoms. First, SSR 16-3p states that the agency "will not disregard an individual's statements about the intensity, persistence, and limiting effects [of an impairment] solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." *See also* 20 C.F.R. § 1529(c)(2) (same, stating "we will not reject your statements about the intensity and persistence of your pain or other symptoms . . . solely because the available objective medical evidence does not substantiate your statements"). Even so, here Plaintiff's diagnostic tests in fact reveal abnormalities, as did many physical examinations and observations by treating or examining sources.[8] Thus, the ALJ's findings as to Plaintiff's subjective complaints of pain and other symptoms lack substantial support in the record as a whole.

---

[8] The ALJ also considered Plaintiff's lack of treatment as a factor in evaluating her subjective complaints. Plaintiff contends she did not seek treatment because she could not afford it, and thus the lack of treatment should not bear on the ALJ's decision making. However, as the Commissioner correctly points out, she was able to continue her treatment for her low back pain and later continued visits with her general practitioner, nullifying her claim that her lack of treatment was due to financial hardship. However, this correct finding of the ALJ is insufficient to uphold his overall determination regarding Plaintiff's subjective complaints of pain and other symptoms.

C.     Remedy

In Social Security cases, the role of this court is to determine whether the law has been properly applied and whether substantial evidence supports the Commissioner's findings, not to find facts.  Because of this limited role, the general rule is to reverse and remand for additional proceedings when errors occur.  *See, e.g.*, Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993) (referring to general practice); Foote, 67 F.3d at 1562 (stating that an insufficient credibility finding is "a ground for remand when credibility is critical to the outcome of the case") (emphasis added); Salter v. Astrue, Case No. 3:08cv189/RV/EMT (N.D. Fla. May 22, 2009 (ECF No. 15)) (same).  A case may be remanded for an award of disability benefits, however, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Davis, 985 F.2d at 534; *see also* Bowen v. Heckler, 748 F.2d 629, 636 (11th Cir. 1984) (if the Commissioner's decision is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the decision with or without remanding the case for a rehearing); Carnes v. Sullivan, 936 F.2d at1219 ("The record . . . is fully developed and there is no need to remand for additional evidence."); MacGregor, 786 F.2d  at 1053 (where Commissioner does not discredit or make any findings regarding the weight of a treating physician's opinions,

the opinions must be accepted as true). Here, the cumulative effect of the evidence does not establish disability without any doubt; therefore, the proper remedy is to remand for additional proceedings.

As a final note, the decision to remand here is bolstered by other errors made by the ALJ, which Plaintiff has not made an issue of directly, but which the court has discovered. First, in addition to misstating Dr. Franck's name, the ALJ included references to physicians or evidence that are not of record. For example, the ALJ stated that Plaintiff's "most recent visit with a doctor was in June 2016 . . . [with] Mustafa A. Hammad, M.D.," who "could not render an opinion on her lumbar spine regarding surgery" (tr. 26). But Plaintiff was seen not by Dr. Hammad; she was seen by Dr. Barrio in June 2016. Although Dr. Barrio is in Dr. Hammad's office (The NeuroPain Center), neither Dr. Barrio nor Dr. Hammad stated they could not render an opinion regarding surgery. Dr. Barrio's treatment record reflects that <u>Plaintiff stated</u> she had been told that "there is no surgical opinion available" (*see* tr. 703–06). More important, Dr. Barrio specifically noted that Plaintiff was in significant pain, "[t]he etiology of which is documented on examination and imaging" (tr. 706). The ALJ made no mention of this crucial statement by a treating physician, when he discounted Plaintiff's complaints of pain and other disabling symptoms due to a lack of objective evidence. Finally, the ALJ found no "medically determinable evidence

of anxiety and depression" (tr. 23), when in fact Plaintiff had been diagnosed with both conditions and prescribed Xanax during the relevant period (*see* tr. 667–68).

These additional errors provide further support for the undersigned's conclusion that the ALJ failed to consider Plaintiff's medical condition as a whole and that his overall findings are not supported by substantial evidence in the record, such that a remand in this case is warranted.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is not supported by substantial evidence and should not be affirmed.  42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at 1560.  This action will therefore be remanded for additional administrative proceedings, to include a redetermination of Plaintiff's RFC, a reconsideration of the medical opinions of record, and a reconsideration of Plaintiff's subjective complaints of pain and other symptoms.

Accordingly, it is hereby **ORDERED**:

1.    That the Commissioner is directed to remand this case to the Administrative Law Judge for further proceedings consistent with this Order.

2.    That **JUDGMENT** is entered, pursuant to sentence four of 42 U.S.C. § 405(g), **REVERSING** the decision of the Commissioner and **REMANDING** this case for further administrative proceedings.

3.      That the Clerk is directed to close the file.

At Pensacola, Florida this <u>29th</u> day of March 2019.


                              <u>/s/ *Elizabeth M. Timothy*</u>
                              **ELIZABETH M. TIMOTHY**
                              **CHIEF UNITED STATES MAGISTRATE JUDGE**